## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| The Estate of Richard J. Castucci, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. 02-CV-11312-RCL |
| v. ) | |
| ) | |
| United States of America, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

On July 1, 2002, the Estate of Richard J. Castucci (hereinafter Plaintiffs) filed this civil action against the United States, two former agents of the Boston office of the FBI (John Connolly and John Morris), and James Bulger, Stephen Flemmi and John Martorano, seeking redress for the wrongful death of Richard Castucci pursuant to the Federal Tort Claims Act (hereinafter FTCA), 28 U.S.C. §§ 2671, et seq., and Chapter 229 of the Massachusetts General Laws. On February 11, 2003, the Complaint was amended to add five former agents of the Boston office of the FBI (Richard Bates, Joseph Yablonsky, James Scanlan, Dennis Creedon, and Thomas Daly).

In October 2003, Stephen Flemmi (hereinafter Flemmi) plead guilty to Racketeering Act #12, the murder of Richard Castucci (hereinafter Castucci) and a series of other murders and criminal offenses. United States v. Stephen Flemmi, Crim. No. 99-10371-RGS; (Ex. XV A). In

conjunction with this plea, Flemmi and the US Attorney for the District of Massachusetts entered

into a "Parties Agreed Statement of Facts" on October 14, 2003 where they agreed that

> In December 1976, Bulger was informed by FBI agent John Connolly that Castucci was
> an informant for the FBI and that Castucci had disclosed the existence of the Greenwich
> Village apartment to the FBI. Bulger told defendant Flemmi, Winter and Martorano
> about Castucci and they decided to murder Castucci . . . On or about December 30, 1976,
> Martorano . . . shot Castucci in the head . . . Martorano left the apartment, and Bulger,
> defendant Flemmi and others cleaned up and disposed of the body. (Ex. XV B at 7-8).

John Martorano (hereinafter Martorano), pursuant to a plea agreement in United States v.

Martorano, et al., Crim. No. 97-10009-MLW; (Ex. XIV B), was a Government witness in the

trial of United States v. John Connolly, No. 99-10428-JLT.[1]  On direct examination, Martorano

testified,

> Whitey Bulger came in one morning and said get in touch with Joe he had got to move
> right away, his friend is Zip, which is John Connolly told him that Richard Castucci had
> notified the FBI where he was . . . Ultimately to solve the problem we were going to take
> Richie out . . . I killed him . . . Whitey Bulger, Stevie Flemmi, Howie Winter and others
> [participated]. US v. Connolly, Tr. Day 4 at 48-51; (Ex. XIV C).

This background and the record as set forth below establishes that Castucci was at the

time of his death a top level FBI informant, handled by Special Agent Thomas Daly (hereinafter

Daly). Castucci was providing Daly with information on the location of federal fugitives, Winter

Hill Gang co-leaders James Sims (hereinafter Sims) and Joseph McDonald (hereinafter

McDonald). The record establishes that at this time, Special Agent John Connolly (hereinafter

Connolly) was the handler of James "Whitey" Bulger (hereinafter Bulger), a FBI Top Echelon

Criminal Informant and a co-leader of the Winter Hill Gang (hereinafter WHG). Connolly

disclosed confidential information to Bulger and Flemmi that Castucci was providing the FBI

with information on the location of federal fugitives Sims and McDonald. This disclosure of

---

[1] In the Indictment in US v. Connolly, the United States alleged in Racketeering Act #7 that Connolly provided
confidential law enforcement information to Bulger, which alerted him to the fact that Castucci was a confidential
informant of the FBI. Fact 366. (Ex. XVI B iii at 10, ¶ 41).

Castucci's informant status to Bulger and Flemmi was the direct and proximate cause of Castucci's murder on or about December 29, 1976.

Plaintiffs move for summary judgment against Connolly and the United States on Counts 5 through 8 based upon Connolly's disclosure of Castucci's informant status to Bulger and Flemmi as this conduct was within Connolly's scope of employment, breached Connolly's and the Government's duty to Castucci and does not fall within the discretionary function exception.[2]

The Plaintiffs also move for summary judgment against the United States on Counts 5 through 8 based upon the failure to control Bulger under his special relationship with the FBI, the FBI's knowledge of Bulger's reputation for violence, the failure of the FBI to protect Castucci from foreseeable harm under his special relationship with the FBI, and the breach of the FBI's nondelegable duty to give care in the protection of Castucci's identity as an informant.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a summary judgment motion, the court construes "the record evidence in the light most favorable to, and [draws] all reasonable inferences in favor

---

[2] Pursuant to 28 U.S.C. § 2679(d)(1), the United States certified that each of the agents named in the Complaint, except for Connolly and Morris, were acting within the scope of their employment and the United States was substituted as a party defendant for these agents on the state law claims. Because the United States has not certified that Connolly was acting within the scope of his employment, he is still a party on the state law claims. Nevertheless, if the government refuses to certify scope of employment, the employee or the plaintiff may at any time prior to trial petition the court for de novo review of whether the employee was acting within the scope of employment. 28 U.S.C. § 2679(d)(3); Gutierrez de Martinez v. Lamagno, 515 U.S. 417, 434 (1995); Operation Rescue National v. United States, 975 F. Supp. 92, 100 (D. Mass. 1997). If the court determines that Connolly was acting within the scope of his employment, the United States will be substituted as a party on the state law claims. By this motion, Plaintiffs request a determination from the court that Connolly was acting within the scope of employment at the time of the incident out of which the claim arises. Should the court not resolve this issue on the pleadings, Plaintiffs request a hearing on scope of employment prior to or in conjunction with trial. See e.g., Operation Rescue, 975 F. Supp. at 108 ("The court may . . . hold evidentiary hearings to resolve immunity-related factual disputes").

of, the non-moving party." <u>ATC Realty, LLC v. Town of Kingston</u>, 303 F.3d 91, 94 (1st Cir.

2002) (citation and internal quotations omitted).  The moving party "bears the initial

responsibility of informing the district court of the basis for its motion, and identifying those

portions [of the record] which it believes demonstrate the absence of a material fact." <u>Celotex v.</u>

<u>Catrett</u>, 477 U.S. 317, 323 (1986) (citation and internal quotations omitted).  Once that burden is

met, the non-moving party must "produce evidence on which a reasonable finder of fact . . .

could base a verdict for it," or else the motion will be granted.  <u>Ayala-Gerena v. Bristol-Myers-</u>

<u>Squibb Co.</u>, 95 F.3d 86, 94 (1st Cir. 1996) (citation omitted).

### III.    STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56.1, attached is a statement of material facts of record as to

which Plaintiffs contend there is no genuine issue to be tried.

### IV.    ARGUMENT

A. THE UNITED STATES IS LIABLE FOR THE DEATH OF CASTUCCI BASED
ON THE NEGLIGENT AND WRONGFUL CONDUCT OF ITS EMPLOYEE,
CONNOLLY.

#### 1.  The United States is Liable for the Conduct of Connolly

In <u>McIntyre v. United States</u>, this Court held that the United States was liable for the acts

of Connolly, in particular the disclosure of the informant status of McIntyre to Bulger and

Flemmi.  <u>McIntyre, et al. v. United States</u>, 447 F. Supp. 2d 54, 105-12 (D. Mass. 2006).

"Connolly's disclosure of McIntyre's identity to Bulger and Flemmi created an unreasonable risk

of harm to McIntyre, and therefore was an obvious breach of duty."  <u>Id.</u> at 108.  This Court

found that the harm to McIntyre was foreseeable to Connolly at the time he made the disclosure

of confidential law enforcement information to Bulger and Flemmi since "FBI Regulations

strictly prohibit revealing an informant's identity.  The reason is obvious.  [A]n informant is

*always* at risk of harm from a disclosure of his identity." Id. at 107 (emphasis in original).  The Plaintiffs are entitled to summary judgment against the United States based upon the same theory of relief.

### 2. Connolly was Acting within the Scope of his Employment

The FTCA serves as a waiver of sovereign immunity for claims "caused by the negligent or wrongful act or omission of any employee of the government, while acting within the scope of his office or employment." 28 U.S.C. § 1346(b).  Whether a government employee is acting within the scope of employment is determined in accordance with the law of the state where the act or omission occurred.  Aversa v. United States, 99 F.3d 1200, 1209 (1st Cir. 1996).

Under Massachusetts law, the conduct of an agent is within the scope of employment if: 1) it is of the kind he is employed to perform, 2) it occurs substantially within the authorized time and space limits, and 3) it is motivated, at least in part, by a purpose to serve the employer. Wang Laboratories, Inc. v. Business Incentive, Inc., 398 Mass. 854, 859 (1986) (citing RESTATEMENT (SECOND) OF AGENCY § 230 (1958) (other citations omitted)).  An act may be within the scope of employment even if forbidden or criminal.  Davis, 340 F. Supp. 2d at 88 (citing RESTATEMENT (SECOND) OF AGENCY § 230 (1958) ("An act, although forbidden, or done in a forbidden manner, may be within the scope of employment") and § 231 ("An act may be within the scope of employment although consciously criminal or tortuous."))

The "kind of activity" prong of the Wang test "requires a determination of the duties a person is employed to perform" such as the handling of informants.  Operation Rescue v. United States, 975 F. Supp. 92, 106 (D. Mass. 1997) (citing Wang, 398 Mass. at 859).  Under Massachusetts law, "it is ordinarily the actual and customary, rather than formally described, duties which determine scope of employment." Id. (quoting Howard, 399 Mass. at 590).  Rather,

"anything which is reasonably regarded as incidental to the work specifically directed" or which is done in connection with such work satisfies this prong. Howard, 399 Mass. at 591 (quoting RESTATEMENT (SECOND) OF AGENCY § 229 cmt. a (1958)). This scope of employment test "is not construed restrictively" nor is it limited to the employee's actual authority. Davis v. United States, 340 F. Supp. 2d 79, 88 (D. Mass. 2004) (citing Clickner v. Lowell, 422 Mass. 539, 542 (1996), Howard v. Burlington, 399 Mass. 585, 590 (1987)).

Castucci was a Top Echelon (hereinafter TE) informant of the FBI from his recruitment in 1970 to his murder on December 29, 1976. Facts 256, 260. He was a gambler and a night club owner and known to associate with organized crime figures. Fact 258. He did not have a reputation for violence. Fact 268. During the mid-1970s, the FBI prioritized the development of underworld informants who could produce information at the management level of organized crime. More particularly, the FBI was interested in a criminal organization referred to as La Cosa Nostra (hereinafter LCN). Facts 1-12, 98, 100. The FBI Manual of Instructions (hereinafter MOI)[3] and memoranda from FBI Headquarters' (hereinafter HQ) to field offices (hereinafter FOs) directed the recruitment of hijackers, robbers, burglars, hoodlums, gangsters, and members of LCN to act as informants. Facts 16-18, 23-28, 35. An entire section of the MOI focused on the development and operation of TE and LCN member informants.[4] Facts 35-36; (Ex. I A). At this time, the FBI was on notice that LCN members or organized crime figures at the management level were involved in acts of violence. Facts 37-40. The FBI instructed its

---

[3] Prior to and through December 1976, the FBI maintained a Manual of Instructions. Section 108 of said manual instructed FBI employees on the recruiting and operation of criminal informants. Fact 29; Ex. I A. Prior to and through December 1976, the FBI maintained a Manual of Rules and Regulations (hereinafter MRR), parts of which addressed FO operations, written communications, FBI classifications, Special Agent promotions, disciplinary matters, legal matters and Agent's training. Fact 30; (Ex. II A).
[4] TE criminal informants were associated with organized crime, in particular LCN, and expected to provide information about criminal activity at the management level. Facts 23, 25, 35, 37, 39.

Special Agents (hereinafter SAs) on the methodology of recruiting such individuals and the characteristics SAs needed to operate criminal informants. Facts 17, 19-22.

In the Boston FO, the recruitment and operation of criminal informants was managed by the C-3 Squad. Fact 412. Beginning in the 1960s, the Boston FO recruited and operated criminals with the reputation of hitmen to act as FBI informants. Facts 41-47. HQ was aware of the background of these individuals. Facts 43-45, 47. Indeed, the FBI had notice that two such Boston informants, Vincent and Stephen Flemmi, were responsible for several of the gangland murders in the Greater Boston area while providing information as informants to the FBI. Facts 42-43, 45-47, 274.

From the 1960s to the mid-1970s, the FBI operated the Criminal Intelligence Program (hereinafter CIP).[5] Facts 13-15. During this period, information on organized crime, in particular LCN, was an FBI priority such that its SAs customarily promised informants protection from underworld enemies and law enforcement investigation in exchange for information. Facts 388-401, 403-09. The FBI instructed its SAs to protect the confidentiality of the informant relationship under all circumstances since it recognized the danger of disclosure of an informant's identity. Facts 66-74. The FBI promised its informants that the informant relationship was confidential and would never be revealed to anyone outside of the FBI. Facts 74-74a.

Prior to 1977, there were no instructional provisions in Section 108 regarding controlling the criminal activity of informants or requiring the reporting of criminal activity of informants to other law enforcement agencies. Facts 57-58, 75-78; (Ex. I A). The obligation of the FO was to advise HQ when the informant showed signs of emotional instability, unreliability, or false information. Fact 59. The protection of the flow of quality information on LCN was paramount.

---

[5] In the mid-1970s, this program was renamed the Organized Crime Program. Facts 13-14.

Fact 9, 11, 427. Informant information was so important that an informant only lost his status due to a lack of production of credible information, death, or the indictment or official criminal investigation of the informant.[6]  Facts 48-50, 52-55, 205, 211, 340-41, 497-98 (lack of productivity or credibility); Fact 51 (death); Facts 48, 54, 56, 232, 493 (indictment or criminal investigation).

During this period the local FOs of the FBI were under the supervision of the Special Agent in Charge (hereinafter SAC). The SAC was ultimately responsible for the FO. Facts 82-94. This included reviewing and directing all of the important matters that were going on in that office. Fact 84. Second in command was the Assistant Special Agent in Charge (hereinafter ASAC) whose duties and authority were, in the absence of the SAC, the SAC's. Fact 93. The office was divided into squads with designated areas of responsibility for investigation. Fact 167. Each squad had a supervisor who was responsible for the squad. Facts 167. The MOI required the SAC to meet with Squad Supervisors (hereinafter SS) on a weekly basis.[7] Fact 83.

The Boston FO's C-3 squad was under the supervision of James Scanlan (hereinafter Scanlan) from at least 1971 through the time of Castucci's death in December of 1976. Facts 170, 410-12. The SS was responsible for conducting complete and thorough case reviews with SAs at least every 60 days, in which informant files and substantive criminal files were reviewed. Facts 96-97, 99. SSs also reviewed the indices on a periodic basis. Fact 103. The SS approved informants and informant status, reviewed all informant information, routed information from the informant, determined the squad game plan, and recommended SA

---

[6] By 1974, the United States Attorney's Office was concerned that the FBI was overprotective of its criminal informants. Fact 407a. By 1976, the United States Attorney issued guidelines on the use of informants which were incorporated into a revised Section 108 of the FBI Manual of Instructions in January of 1977. Fact 490.
[7] Richard Bates was the SAC of the Boston FO from approximately May 18, 1975 to October 27, 1978. Fact 168. Joseph Yablonsky was the ASAC of the Boston FO from approximately April 26, 1976 to July 17, 1978. Fact 169. Dennis Creedon was the Informant Coordinator of the Boston FO from approximately December 1975 to April 1976. Fact 172. Scanlan was the Organized Crime Supervisor from 1970 to 1978. Fact 170.

8

promotions and incentives.[8]  Facts 98, 100-07, 109-10, 137, 413-29.  The performance of the SS was reviewed in the annual office inspection.  The 1976 inspection cited Scanlan for deficiencies in 60-day filing reviews.  Facts 430-36.

SAs assigned to the C-3 squad were responsible for identifying and developing prospective criminal informants and were required to search the indices to determine their suitability.  Fact 111, 114.  SAs could not open a file on a prospective informant unless that individual had an arrest record, criminal associates, or engaged in past or present criminal activities which would make criminal information logically available to him.  Fact 119.  Once a potential informant furnished worthwhile information, the SA handler reported to HQ any signs of emotional instability, unreliability or furnishing false information.  The SA was required to justify the expected productivity of the prospective informant.  HQ would then approve or deny the granting of informant status.  Facts 121-22, 124.  FBI employees were cautioned that informants were also criminals and care must be exercised in dealing with them.  Fact 65.

SA handlers aimed to develop prospective criminal informants to the point where they would regularly contribute information to HQ.  Fact 111.  SAs were instructed to use their ingenuity and new and imaginative approaches in the development of quality sources.  Facts 21, 28.  Indeed, they did.  Facts 259, 286-87, 389, 391.  The development and operation of informants was considered a good measure of the SA's abilities and as such, SAs were evaluated largely on the basis of the quality of their informants.  Facts 184-85, 191, 198.  The FBI appreciated the significance of a SA's ability to gain the confidence of his sources.  Facts 22a, 198.  Promotions and incentive awards to SAs were determined upon the basis of the individual

---

[8] The indices summarized all received information alphabetically under the names of individuals or entities, case numbers, or subjects of information.  Facts 116-17.  Routing was the dissemination of information obtained from informants to other files, FOs, or HQ.  Facts 138-43.

SA's record and accomplishments, oftentimes his development of quality informants. Facts 190, 198-200. Such awards were recommended by the SS and approved by the SAC. Fact 192.

After being approved, no informant could be maintained without routinely submitted justification letters to HQ, summarizing the informant's performance. Facts 123, 148-55. These letters were written and submitted by the informant's SA handler and reviewed by the Informant Coordinator and SS prior to them being sent to HQ. Facts 149-51, 153-54. If an informant's justification letter evidenced his consistent ability to furnish valuable information, he would retain his status. Facts 123, 153.

The C-3 squad was required to collect information, reduce it to writing, and maintain said information in filing systems. Facts 138-138a, 463. These files included a general indices on all subjects of information and informant files, which contained information provided by confidential sources and information that identified the source. Facts 115-17, 119-21, 123, 125-28. There were also substantive criminal investigation files which recorded information on ongoing investigations. Facts 130-36. The FBI established reporting procedures on both informant files and substantive criminal files to HQ. Facts 144-55 (informant), 136, 156-66 (substantive). HQ was on notice of who their informants were. Facts 119-26. Approval, upgrade status and reduction in status were HQ decisions based upon the productivity of the informant. Facts 122-24, 126, 340-41, 347-48, 497-99.

Information obtained from informants concerning criminal activities of individuals and gangs was filed or "routed" to the substantive criminal investigation file of the subject of the information. Facts 138-43. The decision where to route information was made by the SA receiving the information and the SS. Facts 140, 142. The information filed in the substantive

criminal case became the fact basis of the mandatory status report from the investigating case agent to HQ. Fact 163-64. These reports were submitted on an FD-263. Facts 159, 440, 442.

Bulger's official relationship with the FBI began in May of 1971 at which time he reported he was involved in a gang war. Fact 203-04. He was closed in September of 1971 due to lack of productivity, rather than emotional instability. Facts 205, 211. Bulger was reopened as a source by Connolly in September of 1975 and designated a TE informant on February 4, 1976. Facts 203-11, 280, 298. At the time of his approval as a TE informant, HQ had notice of Bulger's violent, unstable character. Facts 216, 278-79, 282-84a. After 1975, it was consistently reported in FBI files that Bulger was a reliable and valuable source of information against the LCN and emotionally stable. Facts 213-15, 217, 449, 495, 499, 504-06. Bulger's opening and operation in 1975 through 1976 were not in compliance with the MOI. Fact 507.

Flemmi's official relationship with the FBI began in 1965. Flemmi became a TE informant on November 3, 1965. Fact 219. Flemmi was closed in September 1969 after he was indicted for murder. Facts 232. Until his indictment, Flemmi was highly regarded as a source on the activities of LCN in the Boston area and consistently reported as reliable and emotionally stable despite an abundance of information on his participation in numerous murders. Facts 44-47, 224-35. After Flemmi became a fugitive in 1969, he was identified in FBI documents as an LCN hitman, armed and dangerous, who would kill anyone without hesitation. Fact 275. After Flemmi's successful flight from prosecution, he returned to Boston where he partnered up with Bulger and began providing information on LCN's activities to the FBI, first through Bulger and then directly to Connolly.[9] Facts 236-45. Flemmi believed he was always an FBI informant. Facts 223, 243-44.[10]

---

[9] In McIntyre v. United States, Flemmi testified that SA Paul Rico warned him of his impending indictment for the murders of Will Bennett and Richie Grasso. Flemmi fled to California, Florida, New York and Canada. About once

Although Bulger was reported to HQ in 1974 as a major league gangster, he soon began to disappear from the substantive criminal files in Boston. Facts 283-85. When Connolly began developing Bulger as an informant in 1974, Bulger had an open criminal intelligence file: 92-1943. Fact 133. Bulger's criminal activities were also reported in the criminal intelligence files of the Mullins Gang (hereinafter MG): 92-1942 and the WHG: 92-1950. Fact 134. By June of 1974, Scanlan recommended to the SAC that Bulger's 92-1943 file be closed.[11] Facts 438-39. In June of 1975, Daly, the case agent of the WHG, reported that Bulger would henceforth be reported to HQ under the MG file. Fact 440. See (Ex. VII A (Winter: 92-1950)). Bulger became an FBI informant on September 18, 1975. Fact 206. In discovery documents, Bulger is last reported to HQ in MG 92-1942 file report dated November 26, 1975. Facts 441-42. See (Ex. VI).

SA Joseph Kelly (hereinafter Kelly) and Connolly jointly interviewed an extortion victims in October 1975 and each submitted reports regarding said interview. Kelly's report mentioned "Whitey" as a perpetrator of the extortion; Connolly's report did not. Facts 443, 445. In December 1975, SA Vaules submitted an informant's FD-209 information that Bulger had a hatchet in his hand while he and Martorano talked to [the victim] and told him they had killed people in the past who failed to cooperate. Facts 139, 447. Later, when Kelly submitted the FD-236 substantive investigation report to HQ on this extortion Bulger's involvement was not mentioned, despite what he knew and Vaules 209. Fact 448. In late 1976, the FBI received information that Bulger, Flemmi and others were extorting an individual named Francis X.

---

a year he would contact SA Rico to see if it was safe to return to Boston. In 1974, SA Rico informed Flemmi that the charges would be dismissed and he could return. Facts 394-97.
[10] Flemmi was officially reopened as an FBI informant in 1980. Facts 500-03.
[11] Bulger's Intelligence File was recommended to be closed because the Boston FO failed to file mandatory 90 day report to HQ, Fact 439, subject to re-opening should additional information be developed warranting further investigation. Fact 438. See also Fact 133; (Ex. V A (Bulger: 92-1943) (Note numerous missing Serials)).

Green. Facts 451-52. Bulger's involvement in this extortion was not reported in any substantive investigation file produced in discovery. Facts 472-76.

Scanlan ran the C-3 Squad. Facts 411-12. Connolly answered to Scanlan. Fact 422a. The SAC had practically nothing to do with handling criminal informant matters and had the utmost faith in Scanlan. Scanlan ran the program. Fact 422b. Scanlan has admitted that he had knowledge of all informant information and substantive investigations in his jurisdiction. Facts 96-97, 99, 103, 413-21, 449. Although no section of the MOI in 1976 expressly required notification to HQ when an informant engaged in a serious act of violence, Scanlan was in the position to make decisions whether or not to report an informant's criminal activity to appropriate law enforcement agencies or to discontinue the informant due to his criminal activities. Facts 62, 62a, 78-81, 422-24. There is no evidence in discovery of any attempt to control the criminal activity of Bulger through 1976. Facts 507-09. Indeed, Scanlan believed Bulger was a valuable and essential informant.[12] Fact 449.

Castucci was murdered on December 29, 1976. Fact 370. Shortly thereafter, Scanlan received TE informant information from SAs in his office that Bulger and Flemmi were responsible for the murder. Facts 459-60, 466, 468. Scanlan also received information, some telephonically, from FBI FOs in New York City and New Haven, Connecticut connecting "Whitey" Bulger to the murder. Facts 458, 461-62, 466 (New Haven Airtel to BS on January 4, 1977). Scanlan stated telephonically that this information was substantially correct with the information he had developed. Fact 462. Information also indicated Bulger and Flemmi were committing a credit extortion on Castucci's widow, a federal offense. Facts 462, 466-67, 469. There are no written reports authored by Scanlan concerning this telephonically received

---

[12] Bates, confronted with Bulger threatening a legitimate businessman with a hatchet, testified that "I'd have some concerns about that . . . Whether you could control him . . . What was - was it vice versa . . . I would be concerned what he allegedly was doing and what the relationship would be with us." See Bates Dep. at 76-77; Fact 449a.

information. Facts 461-62. This is a violation of the FBI MRR. Facts 463-65. Scanlan opened

no inquiry into the murder of Castucci or the credit extortion of his widow. Fact 480. Scanlan

immediately informed HQ that Castucci's murder had nothing to do with his relationship with

the FBI. Fact 482. Then, Scanlan disseminated telephonically received third-hand information

from a friend of Connolly to the SAC Boston. Fact 486. No document indicates Scanlan

informed SAC Boston of FBI TE informant reports of Bulger's involvement in the Castucci

murder. Informant information on Bulger's connection to the Castucci murder was not reported

to HQ in an FD-263 report on the WHG 92-1950 file or in a justification letter for informant BS-

2397-TE. Facts 472-78. Connolly provided information to the Boston Strike Force, protective

of the WHG and never mentioned Bulger. Facts 484-85. Scanlan's manipulation of files and

information was protective of TE Bulger.[13] The Justice Department determined that Scanlan was

acting in the scope of his employment.[14] Fact 486a.

In 2002, the FBI interviewed retired SAC Bates, showing him inserts indicating the

connection of informant Castucci to Bulger through WHG members Sims and McDonald.

> Bates stated that neither Scanlan or Daly brought Castucci's connection to Sims and
> McDonald to his attention . . . Bates explained that at the time (1976), the FBI was
> reluctant to investigate crimes such as murder . . . Bates agreed with the interviewing
> SA's that it would have been appropriate to investigate Castucci's death to determine if
> any investigative techniques, or sensitive FBI information had been compromised. Fact
> 478 (Document not produced to Plaintiffs until after the deposition of Bates). Fact 488.

The record is clear that when Connolly leaked Castucci's informant status, he did so

within the scope of his employment with the FBI. First, managing informants was clearly a

"kind of activity" that Connolly was employed to perform. Coyne v. United States, 270 F. Supp.

---

[13] The protection of Bulger and Flemmi from investigation and prosecution continued under a new C-3 SS, John Morris, in the race fix case of 1978 and 1979. Facts 492-96.

[14] The Defendants did not produce in discovery the annual Boston FO inspection which covered the time period from April of 1976 through September of 1977. Fact 488a. Inspections address FO operations for compliance, efficiency, and effectiveness. Facts 31, 430-36.

2d 104, 109 (D. Mass. 2003) (holding FBI agent's negligent leaking of informant's identity within scope of employment). The primary focus of the FBI in 1976 was the development of informants in order to take down LCN. Facts 1-12. Connolly's official duties were identifying prospective informants, recruiting and developing such prospects, and maintaining a confidential and productive informant relationship such that the informant would regularly contribute quality information to the FBI. Facts 4, 8, 11, 18, 23-28, 34-36, 111-14.

In addition to these formally described duties, Connolly had the actual, customary, and practical duties of maintaining a personal relationship with his source. Fact 20-22a. Gaining the confidence and cooperation of the source was important. Facts 196-200. Since sources were active criminals and could be closed if indicted, protecting the source from investigation was customary. Fact 48, 232, 407a, 493. Informant information was king. Fact 98, 100, 427. As such, SAs routinely promised – and in fact provided – informants with protection from underworld enemies as well as from law enforcement investigations in exchange for the their information. Facts 388-401, 404-09, 492-96. Additionally, FBI documents demonstrate the reporting and routing of Bulger's criminal activities were whited-out at the supervisory level. Facts 437-86. The protection of valuable and essential informants was a customary practice within the Boston FO and conduct that fell clearly within the scope of employment.

Connolly's management of Bulger and Flemmi as informants was endorsed and relied upon by his superiors, as was the employee's conduct in Wang. Wang, 398 Mass at 860. In fact, Connolly's superiors praised him for his handling of informants in performance reviews and graded him as "outstanding" and "excellent." The FBI commended Connolly for his work and recommended promotions, salary increases and monetary awards, and an appointment to train other federal agents on the development and management of informants. The SAC, ASAC, and

SS endorsed Connolly's handling of informants and contribution to the program. Facts 194-202. One such incentive award for outstanding performance in the TECIP read ". . . he has displayed a real talent and skill for gaining the confidence and cooperation of his sources." Fact 198.

The final prong of the Wang test is satisfied if the agent is motivated, at least in part, by a purpose to serve the employer.[15] Wang, 398 Mass at 859. Under Massachusetts law, "the fact that the predominant motive of the [employee] is to benefit himself does not prevent the act from coming within the scope of employment as long as the act is otherwise within the purview of his authority." Id. at 859-60. Only "if the employee 'acts from purely personal motives . . . in no way connected with the employer's interests, [is] he considered in the ordinary case to have departed from his employment and the master is not liable.'" Pinshaw v. Metro. Dist. Comm'n, 402 Mass. 687, 694-95 (1988) (quoting W. Prosser & W. Keeton, Torts 506 (5th ed. 1984)).

The MOI, SAC letters to the field, annual office inspections, and SSs repeatedly stressed the importance of maintaining a steady flow of information from informants and encouraged case agents to use any and all approaches which would bring the FO accomplishments in this area. Facts 2, 4, 8-9, 11-12, 17-20, 23, 25, 28-29, 185-90, 327. Additionally, Connolly's management of Bulger and Flemmi in 1976 clearly furthered the goals of the FBI's informant program. As early as 1976, Connolly and the FBI recognized the importance and potential of the Bulger-Flemmi combination in providing information on LCN. Flemmi was an LCN insider who was offered membership in LCN, socialized with LCN leaders, and was referred to as an LCN hitman. Facts 227-28, 234, 275. Flemmi was a dynamite source; Bulger was his partner in crime and information. Facts 236-45, 502-06. HQ approved Bulger in 1976 as a TE informant. Fact 208. Bulger's importance was lauded in justification letters from 1975 on. Facts 213, 217,

---

[15] The first prong of the Wang test, the "kind of activity" is discussed fully above. There can be no dispute that the second prong, the "authorized time and space limits," is easily satisfied. Facts 111-111a.

504-06. If Bulger was not a productive asset to the FBI, he would have been discontinued. Facts 49-53, 340-41.

There was notice to the FBI that Sims and McDonald were co-leaders of the WHG and participated in several murders with Bulger, Flemmi, and Martorano. Facts 312-21, 326, 334, 338, 348. There was notice to the FBI that fugitives Sims and McDonald were being aided and abetted by the WHG. Facts 248a, 335, 337. There was notice to the FBI that one witness against them was murdered and another was shot. Facts 334, 338-38a. Because Sims and McDonald were joint venturers in murder with Bulger and other members of the WHG, their apprehension by federal authorities posed a threat to the WHG, Bulger, and Flemmi; indeed, Bulger's words to Martorano were "[G]et in touch with Joe he had got to move right away." Fact 367. By leaking that Castucci gave up the location of Sims and McDonald, Connolly protected a valuable FBI source against potential investigation and indictment and gained that source's confidence that he would in fact be protected in return for his information on LCN. Fact 198.

### 3. Massachusetts Law Provides a Remedy against the Defendants

Under the FTCA, the United States may be sued for money damages for personal injury or death caused by the negligent or otherwise wrongful acts or omissions of its employees. See 28 U.S.C. § 1346(b)(1). The statute operates as a limited waiver of the sovereign immunity of the U.S. Muniz-Rivera v. United States, 326 F.3d 8, 12 (1st Cir. 2003). One relevant limitation is that the act or omission targeted by the FTCA suit must be one for which a private person could be sued under "the law of the place where the act or omission occurred," here, the Wrongful Death Statute of Massachusetts, which allows recovery for deaths caused by negligence or other "willful, wanton or reckless act[s]." See 28 U.S.C. § 1346(b)(1); MASS. GEN. LAWS. ch. 229, § 2. "In the context of an FTCA claim, a legal duty of care exists where

there is 'some relationship between the governmental employee[s] and the plaintiff to which state law would attach a duty in purely private circumstances.'" McCloskey v. Mueller, 385 F. Supp. 2d 74, 82 (D. Mass. 2005) (quoting Sea Air Shuttle Corp. v. United States, 112 F.3d 532, 537 (1st Cir. 1997)).

Massachusetts imposes liability on an actor, or that actor's employer, when the actor's negligence causes the death of another person. MASS. GEN. LAWS. ch. 229, § 2. Massachusetts General Laws 229 § 2 reads, in part: "A person who . . . by his negligence causes the death of another person . . . shall be liable in damages . . . A person shall be liable for the negligence . . . of his agents or servants while engaged in his business to the same extent and subject to the same limits as he would be liable under this section for his own act." Id.

Wrongful acts under the FTCA, insofar as investigative and law enforcement officers are concerned, include intentional torts like assault, battery, and malicious prosecution, for causes of action accruing after March 16, 1974. 28 U.S.C. § 2680(h). In addition, in order for the wrongful act or omission of the government employee to be imputed to the United States, it must have been committed within the scope of his or her employment. See 28 U.S.C. § 1346(b)(1).

To succeed in this tort claim against the United States, the plaintiffs must establish that: 1) Connolly owed Castucci a duty, 2) Connolly breached that duty, 3) Castucci suffered injury, 4) Connolly's breach of duty was a proximate cause of Castucci's injury, and 5) in breaching his duty to Castucci, Connolly was acting within the scope of his employment as an FBI agent. See McCloskey v. Mueller, 446 F.3d 262, 267 (1st Cir. 2006) (applying Massachusetts law); Jupin v. Kask, 447 Mass. 141, 146 (2006) (setting forth elements of tort claim under Massachusetts law).

    a.  Connolly Owed Castucci a Duty

"Speaking in terms of classical tort principle, when one claims that negligence lies in the

*commission* of an act, a defendant's duty not to behave negligently typically extends to include all those whom the defendant might reasonably have foreseen to be potential victims of the negligence." Carrier v. Riddell, Inc., 721 F. 2d 867, 868 (1st Cir. 1983) (Breyer, J.) (citing Palsgraf v. Long Island R.R. Co., 248 N.Y. 339, 341-43 (1928) and RESTATEMENT (SECOND) OF TORTS § 281 (1965)) (emphasis in original); see also Remy v. MacDonald, 440 Mass. 675, 677 (2004) ("As a general principle of tort law, every actor has a duty to exercise reasonable care to avoid physical harm to others.") (citing RESTATEMENT (SECOND) OF TORTS § 302 cmt. a (1965)).

A duty exists when "an actor realizes or should realize that [his action] involves an unreasonable risk of harm to another through the conduct of . . . a third person which is intended to cause harm . . . even though [the third person's] conduct is criminal." Jupin, 447 Mass. at 148 (quoting RESTATEMENT (SECOND) OF TORTS § 302B (1965)).  This duty does not depend on any special relationship between a defendant and another person sufficient to give rise to a duty of the defendant to the plaintiff. McCloskey, 446 F. 3d at 267-70.  It is simply the duty that one person owes to another to act with care when his action places that person at an unreasonable risk of harm through the intentional conduct of a third person. However, "the risk of harm to another [must] be recognizable or foreseeable to the actor." Jupin, 447 Mass. at 147.

When Bulger achieved informant status, HQ had knowledge of his reputation for violence and notice of specific examples of his violent activities. Facts 277-87.  HQ knew of Flemmi's reputation as a hitman and described him as such in internal memoranda. Facts 269-76.  Scanlan in his role as the criminal intelligence/organized crime czar knew of Bulger and Flemmi's violent activities. Facts 118, 276, 281-87, 290, 293-98.  Bulger's handler, Connolly, authored numerous reports on Bulger's violent criminal activities, many from Bulger's self reports. Facts 282-83, 284a-85.  Connolly knew Bulger was the undisputed leader of the MG

and that the MG had organized gambling in South Boston and murdered a number of

bookmakers. Facts 284-85. Connolly knew Bulger was a co-leader of the WHG, a criminal

organization that he believed to be more dangerous than the mafia.[16]  Facts 289, 294-96, 327-28.

In 1976, Castucci began reporting sensitive and singular information on the whereabouts

of FBI fugitives Sims and McDonald.[17]  Facts 349-55. This was known to Scanlan, Daly,

Connolly and HQ. Facts 349-55, 359, 361, 366-67, 453-53a. Sims, McDonald, Bulger,

Martorano, and Flemmi were co-leaders of the WHG. Facts 246-48a. During 1976, the FBI

files in Boston were replete with information on the violent character of these individuals. Facts

249-55, 291, 293, 334-38a, 348. FBI files in Boston and HQ were also replete with information

concerning the flight of Sims and McDonald, the support they were receiving from the WHG,

and the murder and shooting of witnesses against them. Facts 334-38a. HQ, Scanlan, Connolly

and Daly all knew or should have known that the WHG supported Sims and McDonald in their

flight from prosecution because of their long history of joint venture violence, past reliability as

WHG operatives, and fidelas to the gang.[18]  Facts 248a, 302-26, 334-38, 379-87.

On the above facts, Connolly owed a duty of care to Castucci. Facts 69-70, 73.

Connolly, as an informant handler, knew very well the risks inherent in being an exposed

informant. These risks were addressed in the FBI's MOI which stated that "It must always be

remembered that one slip or one misstatement may cause a criminal informant to be killed."

Fact 69. Leaking an informant's identity always places the informant at an unreasonable risk of

harm, usually death. Facts 69-70, 74.

---

[16] On March 17, 2002, Connolly stated "They were not cupcakes these guys" and "[Bulger and Flemmi] were probably more dangerous than the mafia . . . when I developed a Top Echelon criminal informant by this very definition of the program I was developing a murderer." Fact 328.

[17] Singular information is information known to a limited number of persons that if disclosed would tend to identify the FBI informant. Facts 74 ¶ 10, 143. See Facts 352, 355 (note the absence of singularity warnings placed on the inserts); cf. Facts 266-67 with 355.

[18] The WHG's reliance on McDonald was reasonable as evidenced by McDonald's future murders of Roger Wheeler and John Callahan. Facts 386-87.

The risk to Castucci's life was apparent, due to the nature of the information he was providing the FBI: the location of the fugitive co-leaders and joint venture felons Sims and McDonald. Their capture would be a threat to the WHG leadership, including Bulger and Flemmi, because of the possibility they could be implicated in a number of violent crimes by Sims and McDonald. Such implication could result in indictment and prosecution of Bulger and Flemmi, and from Connolly's perspective, their closure as informants. Facts 232, 493, 497.

Connolly knew or should have known that leaking Castucci's informant status created an unreasonable risk of harm to Castucci through the criminal conduct of a third person, Bulger himself or another member of the WHG. The risk to Castucci's life was foreseeable. Castucci's informant status placed him in the class of reasonably foreseeable victims, while Connolly's leak was the oracle of his vulnerability therein.

b.  Connolly Breached His Duty to Castucci

An existing duty has been breached when the person who owes the duty commits an act or omission which would place the person to whom the duty is owed at an unreasonable risk of harm. Here, Connolly knew that Sims, McDonald, Bulger, Flemmi and Martorano were co-leaders and joint venturers in a criminal organization more dangerous than the mafia. Nevertheless, Connolly informed Bulger that Castucci had given up the location of fugitives Sims and McDonald. Connolly's affirmative act of leaking Castucci's cooperation with the FBI created, under the circumstances, an unreasonable risk of harm for Castucci. Facts 248a, 356-67.

c.  Castucci Suffered Injury

The injury in this case is obvious: Castucci was murdered. Facts 368-72, 479.

d.  This Breach Was the Proximate Cause of Castucci's Injury

"To establish proximate cause, a plaintiff must show that his or her injuries were within

the reasonably foreseeable risks of harm created by the defendant's negligent conduct." Staelens

v. Dobert, 318 F.3d 77, 79 (1st Cir. 2003) (applying Massachusetts law).  Under Massachusetts

law, criminal conduct is not an intervening or superseding cause which would break the causal

chain so long as the conduct is foreseeable. Poskus v. Lombardo's of Randolph, Inc., 423 Mass.

637, 639-40 (1996).

   It was reasonably foreseeable to Connolly that Bulger or other co-leaders of the WHG

would harm Castucci after learning he was informing on Sims and McDonald.  The murder of an

informant is a reasonably foreseeable risk if his identity is exposed.  Fact 69-70, 74.  The harm to

Castucci should have been clear to Connolly given what he knew about the character of those

individuals threatened by the informant's information.  Facts 282-85, 294-95, 327-28 (Bulger),

178c, 275-76, 299 (Flemmi), 235, 254 (Martorano), 335, 337 (Sims and McDonald), 246, 249,

253, 302-04, 306-26, 381-82 (Government admissions regarding WHG violence).  In fact, these

individuals did kill Castucci shortly after learning he was an informant.  Fact 373-78a.

   e.   Connolly was Acting within the Scope of Employment

   The scope of employment is discussed thoroughly at § B at 5-17 of this memorandum.

   4.   Leaking an Informant's Identity is Not Protected by the Discretionary
        Function Exception

   This case does not implicate the discretionary function exception to the FTCA, which

excepts from the liability of the United States any claim based on a federal agency's or

Government employee's exercise or failure to exercise a discretionary function or duty.  See 28

U.S.C. § 2680(a).  In determining whether the discretionary function exception applies, there is a

three part inquiry.  First, what is the "the conduct that allegedly caused the harm [?]"  Muniz-

Rivera, 326 F. 3d at 15.  The court must examine "particular events that proximately caused the

injuries for which recovery is sought, not the broad policy authority pursuant to which particular

actions were taken nor the constituent subparts of those particular actions." Limone v. United

States, 271 F. Supp. 2d. 345, 355 (D. Mass. 2003).

> Then . . . the court must ask two interrelated questions: 1) is the conduct itself
> discretionary? 2) If so, does the exercise of discretion involve (or is it susceptible to)
> policy-related judgments? If both of these queries yield affirmative answers, the
> discretionary function applies and the government is shielded from liability. Muniz-
> Rivera, 326 F. 3d at 15 (citing, inter alia, United States v. Gaubert, 499 U.S. 315, 322-23
> (1991) and Berkovitz v. United States, 486 U.S. 531, 536-37, (1988).

A decision to act or refrain from acting is discretionary if it is a "matter of choice for the

acting employee." Berkovitz, 486 U.S. at 536.  An act is not discretionary if it violates the

Constitution, exceeds the scope of the official's authority, or violates a federal statute, regulation

or policy which specifically instructs federal officials to follow a specified course of action.

Muniz-Rivera, 326 F. 3d at 15; Thames Shipyard and Repair Co. v. United States, 350 F. 3d 247,

254 (1st Cir. 2003).

This Court held in McIntyre that the discretionary function exception did not apply

because "it is undisputed that disclosing an informant's identity is not an act embraced within the

discretion granted to agents of the FBI.[19]" McIntyre v. United States, 447 F. Supp. 2d 54, 60 (D.

Mass. 2006).  Even if the leak of an informant's identity was a choice by the SA, this conduct is

not discretionary if it violates FBI policies and procedures. Coyne v. United States, 270 F. Supp.

2d 104, 117 (quoting Gaubert, 499 U.S. at 324 ("Where an employee violates an established

policy or regulation, 'there will be no shelter from liability.'") and Irving v. United States, 162 F.

3d 154, 164 (1st Cir. 1998) ("informal agency rules and similar pronouncements may at times

bind agency personnel for the purposes of discretionary function analysis.").

---

[19] In McIntyre, "the applicability of the discretionary function exception [was] a non-issue because the United States [did] not contend that the alleged leak of McIntyre's cooperation [fell] within this exception." McIntyre, United States' Opposition to Plaintiff's Motion for Summary Judgment at 2, Civil No. 01-10408-RCL.

[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive . . . 'when those policies or regulations are violated, liability will necessarily follow.' Berkovitz, 486 U.S. at 536 (quoting Gaubert, 499 U.S. at 324).

The action in question here is the leaking of Castucci's informant status by Connolly, precisely the same conduct at issue in McIntyre. There is no discretion to leak information exposing or tending to expose an FBI informant's status and doing so violates FBI policies and procedures. Facts 69-71, 74.

### B.   THE UNITED STATES IS LIABLE FOR THE DEATH OF CASTUCCI BASED ON THE FBI'S SPECIAL RELATIONSHIPS WITH BULGER AND CASTUCCI.

A person generally does not have a duty to control the conduct of third persons. RESTATEMENT (SECOND) OF TORTS § 315 (1965). Massachusetts law recognizes two exceptions to this rule based upon a special relationship between: 1) "the actor (i.e. the person whose duty is at issue) and the potential plaintiff" and 2) "the actor and the third person." Jean W. v. Commonwealth, 414 Mass. 496, 513 (1993). A special relationship may create a duty in a person or entity to control the actions of another in order to prevent harm to third persons by the one who must be controlled. Mosko v. Raytheon Co., 416 Mass. 395, 400 n.7 (1993). A special relationship exists when "a defendant reasonably could foresee that he would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so." Irwin v. Ware, 392 Mass. 745, 756 (1984). The informant relationship may create a duty to control the conduct of the informant. McCloskey, 385 F. Supp. 2d at 85.

### 1.   The United States is Liable for the FBI's Breach of the Duty to Control Bulger under the FBI and Bulger's Special Informant Relationship.

A private person may be liable for the acts of a third party under Massachusetts law if a special relationship existed "between the negligent person and the person [or entity] on whom it

is sought to impose liability." Estate of Davis v. United States, 340 F. Supp. 2d 79, 91 (D. Mass. 2004). In Davis, the estate of a woman murdered by FBI informants Bulger and Flemmi brought an FTCA action against the United States. Id. at 82. The court found that a special relationship existed between the FBI and Bulger and Flemmi which required the FBI to control their conduct in order to prevent harm to third persons. Id. at 93. This duty to control informants was owed not only to Davis, but also to the general public. Id.; see McCloskey, 385 F. Supp. 2d at 85 (implying that if tortfeasor had been an FBI informant, a special relationship would have existed between government and tortfeasor which would impose an obligation to control informant's conduct); see also Kavanagh v. Trustees of Boston University, 440 Mass. 195, 203 (2003) (finding foreseeability under a duty to protect to mean specific information about a person "suggesting a propensity to engage in violent conduct").

Castucci was an informant in 1976. Fact 256. Bulger was an informant in 1976. Fact 207. The FBI MRR states that "Under [FTCA], Government may be held liable for damages or injuries to an informant or Government witness when Government had knowledge of a threat to harm such person and failed to use reasonable care in providing protection." Fact 447a. In December 1976, Attorney General Levi issued his Informant Guidelines and in January 1977 they were incorporated into the MOI. (Ex. I B). The MOI of 1976 does not mention the rights of third parties or controlling the criminal activity of FBI informants. Cf. (Ex. I A) with (Ex. I B) (additions in section 108I, D, numbers 3, 4, and 5, and addition of Part IV in 1977 MOI). In 1976, Scanlan, Connolly, Daly, and Morris knew or should have known of Bulger, Flemmi, and the WHG's reputation for violence and specific instances of violence. Facts 207, 251, 275-76, 281-82, 284-87, 290-301, 327-28, 334-38a, 348. The knowledge of this information by one of these agents should be imputed to all of the agents. See Commonwealth v. McDermott, 347

Mass. 246, 249 (1964) (finding knowledge of one police officer to be knowledge of all three who cooperated to make arrest). Under principles of agency law, HQ was on notice of Bulger, Flemmi, and the WHG's specific acts of violence and general dangerousness from the aforementioned FBI agents' knowledge of such information. RESTATEMENT (SECOND) AGENCY § 268 (1958) (stating notification to agent is notice to principle when agent authorized to receive notice); see id. at § 271 (notice by third person to agent still notice to principal if agent acting adversely to principal). Irrespective of imputed knowledge, HQ had direct notice. Facts 207, 216, 225, 227, 232-33, 235, 252, 255, 270, 274-76, 278-79, 283-85, 295, 334-36, 338-38a, 348. The FBI instructed on the recruitment and approved the operation of hitmen and gangsters as informants. Fact 4, 18, 35, 40-47, 278-85. In approving Bulger as an informant, the FBI accepted the duty of protecting others. Castucci was frequently in the company of the WHG. Facts 342-43, 348. Under the reasoning in Davis, Castucci is encompassed under the class of foreseeable victims to whom a duty of protection was owed by the FBI. Davis, 340 F. Supp. 2d at 93.

In this case Castucci was acting as an informant against Bulger and the WHG. See Irwin, 392 Mass. at 756 (citing reasonable foreseeability as determinative factor in whether affirmative action to protect must be taken and thus special relationship existed). In the words of Connolly they were in the "murder and mayhem business". Facts 40, 42, 45-47, 251, 299-301, 328, 334-35, 338a. Castucci was supplying the FBI with singular information on two fugitive WHG co-leaders. Facts 248a, 346-55. This was known to Scanlan, Connolly, Daly, and HQ. Facts 349-55, 359, 361, 366-67, 453, 453a. Therefore, it was reasonably foreseeable that affirmative action would need to be taken to protect Castucci by controlling Bulger. See Kavanagh, 440 Mass. at 203 (foreseeability present when party knows of an individual's specific propensity for

violence); Fact 248a.  As a result of the FBI's special informant relationship with Bulger, the FBI

owed Castucci a duty which was breached by the FBI's failure to control the foreseeable

criminal acts of Bulger.

> 2. The United States is Liable for the Reasonably Foreseeable Harm Caused to
> Castucci Based on the Special Relationship between the FBI and Castucci.

A duty to protect another from the criminal conduct of a third party exists when there is a

special relationship between the defendant and the injured victim. Kavanagh, 440 Mass. at 201

(citing Luoni v. Berube, 431 Mass. 729, 731 (2000)).  The FBI had an informant relationship

with Castucci.  Facts 256-62.  Therein, the FBI had a duty to protect Castucci from the criminal

conduct of third parties when the FBI could reasonably foresee that it would be expected to take

affirmative action to protect Castucci.  See (Ex. I B); Fact 447a; Davis, 340 F. Supp. 2d at 93

(finding informant relationship to be a special relationship for tort law purposes);  see Coughlin

v. Titus & Bean Graphics, Inc., 54 Mass. App. Ct. 633, 639 (2002) (stating that reasonable

foreseeability in special relationship/duty to protect context is determined by examining all

circumstances).  As discussed on page 26 of this Memorandum, HQ, Scanlan, Connolly and Daly

had knowledge that Castucci was informing on the WHG and therein Bulger.  A principal has

imputed knowledge of an agent, even if she acting entirely for her own purposes which are

adverse to the interests of the principal, when "the failure of the agent to act upon or to reveal the

information results in a violation of a contractual or relational duty of the principal to the person

harmed [by the violation]."  See RESTATEMENT (SECOND) AGENCY § 282(2)(a) (1958) (finding

principal may be liable to third persons through notice of its agent when agent acting for own

purposes which are harmful to principal's interests by violation of contract or relationship duty);

cf. Baena v. KPMG LLP, 453 F.3d 1, 7 (1st Cir. 2006).  Even if Connolly's leak was adverse to

the FBI because it violated the MOI, and even if it was entirely motivated by a personal desire to

protect Bulger, the FBI is still liable because the failure of Connolly to reveal this information to the FBI violated the FBI's promise to protect the identities of informants. See RESTATEMENT (SECOND) AGENCY § 282(2)(a) (1958) (finding liability when failure of agent to reveal information results in harm to one who has a "contractual or relational duty" with principal); Fact 257. The FBI benefited from Connolly's unauthorized act, as it accepted information Bulger gave as an informant after Castucci's death. Nat'l Credit Union Admin. v. Ticor Title Ins. Co., 873 F. Supp. 718, 727 (D. Mass. 1995) (premising principal's liability partially on its benefit from agents' wrongdoing); Facts 213, 492-99, 504-06.

The facts demonstrate Castucci did rely on the FBI's promise of confidentiality. He was informing on the WHG in December 1976, went unaccompanied to their lair on the day of his murder, and was subsequently shot in the back of the head by someone who obviously knew him well. Facts 348-55, 370, 372, 479, 482; see Irwin, 392 Mass. at 756 (finding foreseeability may be based on reasonable reliance). The FBI is liable for its failure to protect its informant who was inside the foreseeable danger zone of harm due to his relationship with the FBI.

C. THE UNITED STATES IS LIABLE WHERE CONNOLLY BREACHED A NONDELEGABLE DUTY THAT THE FBI OWED TO CASTUCCI TO GIVE CARE IN HIS PROTECTION CREATED BY EXPRESS AGREEMENT.

"A nondelegable duty is an affirmative obligation to ensure the protection of the person to whom the duty runs." Meyer v. Holley, 537 U.S. 280, 290 (2003) (quoting General Building Contractors Assn., Inc. v. Pennsylvania, 458 U.S. 375, 396 (1982)). A master who undertakes a duty to have care used to protect another is liable for harm caused to that other person when the master's servant fails to perform the duty. RESTATEMENT (SECOND) OF AGENCY § 214 (1958). A master may be liable for the acts of its servant taken outside the scope of his or her employment when such acts violate a nondelegable duty of the master. Id. at § 219(2)(c). A nondelegable

duty may be created by express agreement. O'Brien v. Christensen, 422 Mass. 281, 287 (1996).

Contractual obligations can provide a viable tort action. Parent v. Stone & Webster Engr. Corp.,

408 Mass. 108, 113 (1990).

A nondelegable duty can be created where parties have an agreement to keep something

safe. In Banaghan, an elevator repair company entered into an oral agreement with the trustees

of a building where the company would keep the elevator in safe operating condition. Banaghan

v. Dewey, 340 Mass. 73, 79 (1959). The court held that the trustees had a duty to maintain the

elevator safely which was not discharged by carefully selecting a contractor. Id.; see O'Brien,

422 Mass. at 287 (finding agreement in Banaghan to be "an express agreement" which could not

be discharged by giving task to independent contractor) (quoting Glassman v. Hamel, 341 Mass.

422, 424-25 (1960)); see RESTATEMENT (SECOND) AGENCY § 214 cmt. a (1958) (stating principal

may be liable for acts of agent outside scope of employment by entering into contract or "certain

relations" with person harmed); RESTATEMENT (SECOND) AGENCY § 214 cmt. e (1958) (finding

liability of principal even if actor with duty acts for own purposes with no intent to benefit

principal); see also Meyer, 537 U.S. at 290 (finding possibility of liability where agent acting

outside scope of authority and principal did everything required).

The FBI and Castucci had an express agreement that the FBI would protect Castucci's

confidential informant identity. Fact 257. This express promise from the FBI to informants is at

the core of the FBI informant program. Facts 66-74a, 257. Castucci, in relying on the FBI

promise, took a 0.38 cal. bullet to the brain. Facts 263-65, 285, 298, 346-55, 368, 370, 482a.

The express agreement of the FBI to give care in the protection of Castucci's identity,

and therein his person, created a nondelegable duty in the FBI. O'Brien, 422 Mass. at 287

(finding express agreement to safely repair porch to create nondelegable duty to act in safe and

careful manner). The FBI concedes that there is a high probability of death when an organized crime informant is exposed. Facts 69, 70, 72-74a. Connolly's access to Castucci's status as an informant was through his employment by the FBI; Connolly's relationship with Bulger was through his employment by the FBI; Connolly's leak breached the FBI's duty of confidentiality. Facts 69, 70, 74, 257, 278, 280, 282-84a. The motivation for this leak is irrelevant; whether it was intentional or an inadvertent slip of the tongue, liability will follow. RESTATEMENT (SECOND) AGENCY § 214 cmt. e (1958) (contemplating duty to protect another by agreement to be nondelegable regardless of intent of actor who breaches duty). Therefore, the United States is liable for the FBI's breach of the nondelegable duty created by its express agreement to give care in the protection of Castucci's identity as informant.

WHEREFORE, plaintiffs respectfully request that this Honorable Court:

   a. Grant summary judgment against Connolly on Counts 5 through 8, substitute the United States as a party for Connolly;

   b. Grant summary judgment against the United States on Counts 5 through 8;

   c. Schedule a hearing on damages; and

   d. Grant such further relief as this Court deems necessary and just.

Respectfully submitted,

Dated: June 7th, 2007                    The Estate of Richard J. Castucci

                                         /s/ Michael Laurano
                                         Michael Laurano
                                         15 Court Square, Suite 360
                                         Boston, MA 02108
                                         BBO # 288200
                                         (617) 523-4499