## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| The Estate of Richard J. Castucci, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 02-CV-11312-RCL |
| ) | |
| United States of America, et al., ) | |
| ) | |
| Defendants. ) | |

## CASTUCCI PLAINTIFFS' REPLY TO UNITED STATES' OPPOSITION TO CASTUCCI PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The Defendant opposes Plaintiff's motion for summary judgment by alleging a number of material questions of fact as to the Plaintiff's first theory of recovery, breach of duty by SA Connolly ("Connolly") while in the scope of his employment as an FBI agent, and a legal argument, challenging the Plaintiff's additional theories of recovery under the FBI's special relationship duty to informants and the nondelegable duty the Defendant owed to Richard Castucci ("Castucci").

### I.    There is No Genuine Issue of Material Fact that (A) John Connolly was the Source of the Leak of Richard Castucci's Cooperation with the FBI and that (B) Castucci's Informant Status was the Proximate Cause of His Murder.

"A genuine issue exists if there is 'sufficient evidence supporting the claimed factual dispute' to require a choice between the parties' differing versions at trial." Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. 1975). "A material issue is one that 'affect[s] the outcome of the suit.'" Garside, 895 F.2d at 48 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

**A. There is No Genuine Issue of Fact that Connolly was the Source of the Leak Under FED. R. EVID. 801(d)(2)(B)**

The Defendant has admitted, on five (5) occasions and documents, that Connolly leaked Castucci's informant identity to James Bulger ("Bulger") and Steven Flemmi ("Flemmi").

1.) The Indictment of John Connolly

The indictment of Connolly charged that from at least 1976, using confidential FBI information to alert Bulger and Flemmi to the identity of confidential law enforcement informants to protect Bulger and Flemmi's ongoing criminal activities, knowingly omitting material from FBI documents to protect Bulger and Flemmi, and endeavoring to preserve Bulger and Flemmi's status as informants by failing to report their criminal activity. See Racketeering Act No. 7; Plaintiff's Ex. (XVI B iii) at 4-5.[1]

2.) Opening and Closing Argument of the United States in U.S. v. Connolly

In its opening, the Defendant stated "Bulger came to Martorano, Winter, and others, and said, hey, look, John Connolly told us that a particular individual, you will hear his name, John Connolly told us that Richard Castucci was an informant, and Richard Castucci was going to give up, or has given up, information on where some of our gang members who are fugitives are located . . . once they had the information that Mr. Castucci was an informant . . . Mr. Martorano, Mr. Winter, Mr. Bulger, Mr. Flemmi murdered Richard Castucci within short order." See Ex. (XIV D), Opening of United States on May 8, 2002.

In its closing argument the Defendant stated "John Martorano testified with respect to this matter. John Martorano lays out what had happened. John Martorano told you that Bulger came and said that John Connolly, the defendant, had advised him that Castucci was an

---

[1] Exhibits referred to are Plaintiff's Exhibits in Support of Summary Judgment, filed on June 7th, 2007. Attachments referred to herein are affixed to this pleading.

informant for the FBI and that Castucci could give up the location of Joe McDonald and Jim

Sims . . . You know from Government Exhibit 13 that Castucci was in fact an informant . . . you

know from Government Exhibits 14-17 that in the fall of 1976 Castucci was giving even more

specific information as to where McDonald could be found in New York.  Now, is this another

incredibly lucky guess on the part of John Martorano?  See Ex. (XIV D), United States' Closing

on May 23, 2002.

     3.) Agreed Statement of Facts in U.S. v. Flemmi

     The United States agreed that Bulger was informed by Connolly that Castucci was an

informant for the FBI and that Castucci had disclosed the existence of the Greenwich Village

apartment to the FBI.  Bulger told defendant Flemmi, Winter, and Martorano about Castucci, and

they decided to murder Castucci.  See Ex. (XV C) at 7.

     4.) Plea Colloquy of Steven Flemmi in U.S. v. Flemmi

     Bulger was informed by agent John Connolly that Mr. Castucci was an informant for the

FBI and that Mr. Castucci was providing information about the whereabouts of McDonald and

Sims . . . and having the information provided by Mr. Connolly regarding Mr. Castucci, Mr.

Bulger informed Mr. Flemmi, Mr. Winter, and Mr. Martorano about Mr. Castucci, and they

decided to murder Mr. Castucci . . . Martorano shot Mr. Castucci in the head . . . Bulger, Flemmi,

and others cleaned up and disposed of the body.  Flemmi admitted these facts under oath to

Judge Stearns.  See Plaintiff's Summary Judgment Ex. (XV D) at 34, 51.[2]

    **B.  There is No Genuine Issue of Fact that Connolly's Leak was the Proximate**
       **Cause of Castucci's Murder**

---

[2] Flemmi testified in his deposition in McIntyre v. U.S. that he was present at a meeting that occurred between him, Connolly, and Bulger, and that he remembered Castucci's name coming up with regard to the apartment in New York.  See Att. E, Flemmi. Dep. at 155:8-25.

The Defendant has argued that a "genuine issue of material fact exists as to whether Castucci was killed because the Winter Hill Gang ("WHG") owed him money," pointing to Flemmi's deposition testimony.  During the deposition, the Defendant asked:

> **Q.** At the time, around the time of Mr. Castucci's death, did Winter Hill owe a large sum of money to Mr. Castucci?
> **A.** Yes.
> **Q.** And, again, around the time of Mr. Castucci's death, did Winter Hill owe a large amount of money to Jack Mace through Mr. Castucci?
> **A.** Yes.

See United States' Response to Plaintiffs' Statement of Material Facts as to Which There is No Genuine Issue to be Tried at 8; Flemmi Dep. at 355-56, attached to United States' Response as Tab A.  The Defendant, in using this deposition excerpt, has proven the Plaintiff's point.  The second question is merely a clarification of the first.  The WHG did owe a large amount of money, but it was to Jack Mace ("Mace"), which was to be paid through Castucci.

John Martorano ("Martorano") testified in U.S. v. Connolly in questioning by the Defendant that Castucci introduced him to a fellow named Jack from New York.

> **Q.** And as it relates to Jack . . . what activity did you and others in the Winter Hill Group have with Jack?
> . . .
> **A.** We would place bets with him on sports and horses and set it up once a week.  Somebody would fly out there or make a transfer for Richie Castucci with him in the beginning.
> . . .
> **Q.** And at times, was there a significant amount of money owed to Jack as a result of the wagering that was going on?
> **A.** The last week we were doing business it was one hundred fifty thousand for the week.
> **Q.** That was owed to New York?
> **A.** Right

See Plaintiff's Summary Judgment Ex. (XIV C), Martorano Trial Testimony on May 13, 2002, at 46-47.  The Defendant proffered this testimony from Martorano for the truth of the matter asserted that the $150,000 that was owed by the WHG was owed to Jack from New York and not Castucci.  This is the Defendant's official position at trial.  It is an admission of the Defendant in proffering this testimony.  FED. R. EVID. 801(d)(2)(B).

Connolly's trial counsel attempted to create a reasonable doubt that Castucci was

murdered over money owed him by the WHG and not because his informant status had been

exposed.  Martorano was cross-examined on this issue at U.S. v. Connolly:

> **Q.** Do you recall Mr. Castucci winning a lot of money from Hill bookies in 1976?
> **A.** No, but it's possible.
> . . .
> **Q.** But if he was one of the people who won big, he was one of the people paid that money; isn't
> that right?
> **A.** Yes, but I don't recall him winning big.
> **Q.** At some point, Mr. Castucci had to pay a portion of what he won to the Hill; isn't that right?
> **A.** I don't recall that.  He wasn't a bookmaker.
> . . .
> **Q.** He was a swindler, he swindled Winter Hill money; isn't that right?
> **A.** No, I don't think he would try that.
> . . .
> **Q.** Now, at some point, Mr. Castucci introduced you to a bookie in New York by the name of
> Jackie; isn't that right?
> **A.** No question.
> . . .
> **Q.** So at the time Mr. Castucci died, you owed Jack approximately $400,000?
> **A.** No, 150.
> **Q.** And you had paid him 250 before that right; is that right?
> **A.** I paid him 400 before that, in the course of months.
> **Q.** But at the time of Mr. Castucci's death, 150 was outstanding?
> **A.** Yes.
> **Q.** And Mr. Castucci was the person responsible for picking up the money to go to Jack
> primarily; isn't that right?
> **A.** Sometimes.
> **Q.** More times than not?
> **A.** Well, I arranged a guy to bring money out there also.  Met him in New York at the airport.
> **Q.** Now, after Mr. Castucci's death, members of the LCN from New York came to Winter Hill
> collect the amount owed; isn't that right?
> **A.** Correct.
> **Q.** And you were at that meeting; were you not?
> **A.** Correct.
> **Q.** And at that point, you told members of the LCN that you didn't have to pay the debt because
> Jackie was an informant or a rat; isn't that right?
> **A.** It's a good possibility he was – he was the one who told Richie Castucci where Joe McDonald
> was hiding.
> **Q.** Because Jackie knew where Mr. McDonald was hiding; isn't that right?
> **A.** And he's the only one I knew – I mean, I knew him, but he knew Richie.  It's the only person
> we both knew.
> **Q.** So when you told the members of the LCN that Jackie was the rat, you were telling them that
> because Jackie had giving up the location of the apartment, isn't that right?
> **A.** To Richie.
> **Q.** To Richie?
> **A.** Precisely.

. . .

Q. Well wasn't Mr. Castucci at the meeting where you arranged for the apartment with Jackie?
A. Nope. He knew nothing about it.
Q. So the only two people that knew the location of the apartment, according to you, is Jackie in New York and you; isn't that right?
A. And Stevie Flemmi.

. . .

A. We told them we're not paying. You want us to take care of Jack, we'll take care of Jack, because he's still a problem for us.

. . .

Q. And the reason you said he was still a problem was because he was a rat; isn't that right?
A. To Richie – he told Richie what he shouldn't have told him.

. . .

Q. Now, you – as soon as you found out that the apartment had been given up, you told McDonald to move; isn't that right?
A. Correct.

. . .

Q. And that's well before December of 1976; isn't it?

. . .

A. No, I don't think it was well before. Very, very – very close to it.

. . .

Q. So it's possible you had gotten him out long before that; isn't that right?
A. Not long before it. It was almost a day, maybe two, at the most, after I heard the apartment was given up that I told him to leave, and a few days after that Richie got killed.
Q. So it's all within a week; is that your testimony?

. . .

A. At least within a week.

See Att. A, Tr. Day 5 at 173, 176-182. Martorano's testimony on cross leaves no doubt

that the WHG owed a large amount of money to Mace, not Castucci.[3]  Castucci acted as a courier

for Mace. Defendant presently proffers no evidence that murdering Castucci cancels the debt to

Mace. Mace attempted to collect the debt after Castucci's murder through the New York LCN

and the WHG refused to pay Mace because they believed he was Castucci's source of

information on the location of Sims and McDonald. Thus, it is clear from Martorano's testimony

that the money owed to Mace by the WHG was not the proximate cause of Castucci's murder – it

was the informant information Castucci provided the FBI. Indeed, the WHG still had a problem

with Jack Mace and was ready to take care of him.

---

[3] See also Ex. (IV H) at 58-59, Richard Castucci, Jr., Dep. "The money was going to a guy in New York named Jack."

The Defendant uses the Trial Testimony of Flemmi from <u>McIntyre v. U.S.</u> elicited by

plaintiff McIntyre to argue that Flemmi's stated reason for Castucci's murder is inconsistent:

thus there is an issue of fact as to whether his murder was revenge for being a rat or over money

owed. <u>See</u> United States' Response to Plaintiffs' Statement of Material Facts as to Which There

is No Genuine Issue to be Tried at 20. The Defendant cites Flemmi's testimony:

> Q. And Mr. Castucci was killed?
> A. He was killed.
> Q. Because he was an informant?
> A. That's correct.
> Q. And because his information regarding McDonald and Sims was a threat to the Winter Hill Group?
> A. It was kind of a revenge thing. It was – that happened, yes.
> Q. Because Mr. McDonald was threatened, the group was threatened, right?
> A. Well – they were already notified not to go to that apartment, but there was other circumstances also involved there. That was part, the revenge part of it, and then there was another aspect to it in terms of there was some money owed.

<u>See</u> Att. B, Tr. Day 2 at 13-14. The Defendant, however, failed to include the next three

questions and answers after this excerpt:

> Q. But Castucci was killed after you found out he was an informant?
> A. That's correct.
> Q. And after you found out he was an informant for the FBI?
> A. That's correct.
> Q. And after you found out that he had given up the apartment in Greenwich Village?
> A. Basically that's what happened.

<u>Id.</u> at 14. Flemmi's testimony proffered by the Defendant is not inconsistent with his

testimony on motive in <u>U.S. v. Connolly</u>. The Defendant had the opportunity to seek

unequivocal answers from Flemmi on the subject in his deposition and in the <u>McIntyre</u> trial.

Certainly it was in the Defendant's interest in the <u>McIntyre</u> trial to demonstrate that Castucci's

murder had nothing to do with his informant status, thus diminishing foreseeability and

proximate causation that another informant, McIntyre, would be murdered because of a Connolly

leak. The Defendant preferred not to go there, because it is a prisoner of the truth, as fully

revealed in Martorano's <u>Connolly</u> testimony. The large sum of money was owed to Mace.

The Defendant's evidence from Flemmi "there was some money owed" is not significantly probative of an alternative causation theory. See Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)). The subject evidence does not illustrate a different version of the truth. Thus, it does not create a genuine issue for trial. Id.

Additionally, and most significantly, this issue of a money motive is not a material fact under the law of proximate causation. For proximate causation to be established, the plaintiff must show the harm complained of was "within the reasonably foreseeable risk of harm created by [the negligent conduct of the defendant]." Poskus v. Lombardi's of Randolph, Inc., 423 Mass. 637, 640-41 (1996). "Whether negligent conduct is the proximate cause of an injury depends not on factual causation, but rather on whether the injury to the plaintiff was a foreseeable result of the defendant's negligent conduct." Kent v. Commonwealth, 437 Mass. 312, 320 (2002) (citing Jesionek v. Massachusetts Port Authy., 376 Mass. 101, 105 (1978). The defendant's negligence need not be the only factor causing the harm; rather, it must be found that "a defendant's negligence was a substantial factor in bringing about injury and harm." Bernier v. Boston Edison Co., 380 Mass. 372, 385-386 (1980). The foreseeability of Castucci's demise resulting from Connolly's leak is fully discussed and established in the Plaintiff's Memorandum in Support of Summary Judgment at page 22.

## II.      There is No Genuine Issue of Material Fact that Connolly was Inside the Scope of his Employment When He Leaked Castucci's Informant Identity

The Defendant contends that a "genuine [issue] of material fact exists as to whether, under the law of Massachusetts, Connolly was motivated by an intent to serve his master and

whether the alleged conduct of leaking Castucci's cooperation was the kind of work he was employed to perform." U.S. Opposition at 1.

Under Massachusetts law, the conduct of an agent is within the scope of employment if it: 1) is of the kind he is employed to perform, 2) occurs substantially within the authorized time and space limits, and 3) is motivated, at least in part, by a purpose to serve the employer. Wang Laboratories, Inc. v. Business Incentive, Inc., 398 Mass. 854, 859 (1986) (citing RESTATEMENT (SECOND) OF AGENCY § 230 (1958) (other citations omitted)). The Defendant argues that the first and third prongs of this test have not been satisfied. See U.S. Opposition at 1, 4-7.

### A.      There is No Genuine Issue of Material Fact as to the "Kind of Activity" Prong

The Defendants argue that the conduct at issue does not satisfy the "kind of activity" prong and therefore, Connolly's acts fell outside the scope of his employment. Id. at 1, 6-7.

> Plaintiffs argue ... the handling of informants is the kind of work an FBI agent is employed to perform ... plaintiffs have failed to adduce any evidence that the harm causing conduct at issue – leaking informant names to criminals that were making corrupt payments to Connolly – is the type of work an FBI agent "employed to perform."

Id. at 6. The scope of employment tests requires the analysis of the duties a person is "employed to perform;" however, it "is not construed restrictively" nor is it limited to the employee's actual authority. Wang, 398 Mass. at 859; Davis v. United States, 340 F. Supp. 2d 79, 88 (D. Mass. 2004) (citing Clickner v. Lowell, 422 Mass. 539, 542 (1996), Howard v. Burlington, 399 Mass. 585, 590 (1987)). Rather, "anything ... reasonably regarded as incidental to the work specifically directed" or done in connection with such work satisfies this prong. Howard, 399 Mass. at 591 (quoting RESTATEMENT (SECOND) OF AGENCY § 229 cmt. a (1958)).

It is well-established that an act may be within the scope of employment even if it is forbidden or criminal. Davis, 340 F. Supp. 2d at 88 (citing RESTATEMENT (SECOND) OF AGENCY

§ 230 (1958) ("An act, although forbidden, or done in a forbidden manner, may be within the scope of employment") and § 231 ("An act may be within the scope of employment although consciously criminal or tortious."). It is clear from a common sense reading of the FTCA, that the statute was intended to govern such criminal or tortious acts.[4] See 28 U.S.C. §1346(b)(1). The statute reads in part:

> [T]he district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment. 28 U.S.C. §1346(b)(1).

The Defendant also claims that the Plaintiffs' focus on the management of informants is misplaced because "[i]n this jurisdiction, the scope of employment inquiry is made on an 'act-by-act' basis. See, e.g., Lyons v. Brown, 158 F.3d 605, 608-609 (1st Cir. 1998)." U.S. Opposition at 6. The Defendant's mistake in this argument is stating what the law is "in this jurisdiction" and then citing to a case that originated in Maine. Applying a Maine case to the case at hand is erroneous since scope of employment questions are determined in accordance with the law of the state where the act or omission occurred. Aversa v. United States, 99 F.3d 1200, 1209 (1st Cir. 1996). Thus, one must consider the law of Massachusetts, not Maine. Even the cited case reads "[T]he scope issue should be determined under Maine law." Lyons, 158 F. 3d at 609. In fact, Maine's scope of employment test varies considerably, as it adds additional requirements to the Massachusetts Wang test. Id. Further, the Defendant has misread the case.

---

[4] In McIntyre v. United States, this Court held that the "kind of activity" which Connolly was hired to perform was in fact, the management of informants, stating "Surely no government employee is hired to engage in wrongful conduct. Nevertheless, the FTCA creates a remedy for wrongful conduct by government employees ... [I]nsofar as 'investigative or law-enforcement officers' of the United States are concerned, wrongful conduct includes a variety of intentional torts. . . One assumes [they] are not hired to commit assaults, to batter, or to prosecute maliciously. Yet the FTCA provides a remedy against the United States for such misconduct. [The United States' argument] ... makes the FTCA entirely pointless." See Findings of Fact and Conclusions of Law at 93-94, McIntyre v. United States, Civ. No. 01-CV-10408-RCL.

Lyons v. Brown is a sexual harassment case in which a U.S. Attorney certified that a federal employee was:

> . . . generally acting within the scope of employment ... Specifically, the certificate identified 22 of 240 paragraphs of the complaint as compromising certified conduct; for example, the U.S. Attorney did not certify the alleged inappropriate hugging and pushing.

Id. at 607.  This case focused on whether the government may certify certain acts of their employees as being within the scope of employment while denying others pursuant to 2679(d)(1).[5]  It would be inappropriate to extend the act-by-act determination to the "kind of activity" prong, since certification is not determined by state law.[6]

Lastly, the Defendant asserts that "[u]nder Massachusetts law, this kind of criminal conduct, which is wholly unrelated to or in furtherance of any legitimate governmental business, falls outside the scope of employment."[7] U.S. Opposition at 7 (citing Worcester Insur. Co. v. Fells Acres Day School, 558 N.E.2d 958 (Mass. 1990)).[8]  However, the Plaintiffs have never argued that the leak was a criminal act and Plaintiffs need only prove the leak was a negligent act.  See this document at 7-8.  Plaintiffs' position is that, under Massachusetts law, acts that are forbidden or criminal may fall within the scope of employment.  Id. at 2-3; Davis, 340 F. Supp. 2d at 88 (citations omitted).  Therefore, the Plaintiffs' have satisfied the "kind of activity" prong.

**B.      There is No Genuine Issue of Material Fact as to the "Motivated, in**

---

[5] This is evidenced by the language "The Westfall Act speaks of certification not of 'the claim' but of 'the incident out of which the claim arose,' 28 U.S.C. §2679(d); 'incident' could easily be equated with 'act' or 'event.'" Id.

[6] The Lyons court relied on cases from many states.  To apply those cases to a Massachusetts scope of employment inquiry would be in conflict with the long-standing rule of Aversa. See Aversa, 99 F.3d at 1209.

[7] The Defendant defines the "criminal conduct" as "the leak of information to individuals with whom Connolly had engaged in a criminal conspiracy." U.S. Opposition at 7.  However, there is no evidence of any such conspiracy until at least 1981, well after the death of Castucci.  See this document at 7-8.

[8] No language in this case supports the proposition that challenged conduct must be related to or in furtherance of a legitimate government business in order to fall within the scope of employment.  See Worcester Insur. Co., 558 N.E.2d at 958 (Mass. 1990).  The only mention of "legitimate activities" is in a footnote which reads: "We need not reach this issue ... None of the acts ... can be interpreted as 'originating in' any legitimate activities 'closely associated with the employment relationship." Id. at 967 n.13.  Moreover, the cases are so factually inapposite that it is inappropriate to compare them.  The cited case involved allegations that sexual "assaults and batteries 'were performed [on children at a day-care] by one or more agents, servants, and/or employees of the defendant school while ... acting within the course and scope of their employment.'" Id. at 966.

**Part, by a Purpose to Serve Employer" Prong**

The Defendant further alleges that the Plaintiffs have failed to satisfy the third prong of the Wang test. U.S. Opposition at 5-6. First, the Defendant asserts that the Plaintiffs have provided "no evidence, direct or indirect" of John Connolly's motivation for the leak.[9] Cf. Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment at 16-17, Docket No. 111. The Defendant also argues that:

> . . . plaintiffs' burden of proof cannot be satisfied by an <u>unsupported inference</u> of Connolly's intent to serve his employer in part. See, e.g., Lipsett v. University of Puerto Rico, 864 F.2d 881, 895 (1st Cir. 1988) (emphasis added). U.S. Opposition at 5.

However, an inference is by definition supported; without the proper support, an inference may not be made. Moreover, the Lipsett v. University of Puerto Rico case cited by the Defendant actually reads "[W]e will not refuse to affirm a grant of summary judgment in favor of the defendant if the plaintiff rests merely upon 'unsupported allegations and speculations.'" Lipsett, 864 F.2d at 895 (quoting Oliver v. Digital Equip. Corp., 846 F.2d 103, 110 (1st Cir. 1988)) (emphasis added). There is no speculation in the Plaintiffs' Statement of Material Facts.

Moreover, the inference that John Connolly's conduct was motivated, at least in part, to serve his employer, is overwhelming. The factual evidence presented by the Plaintiffs in their Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment as well as the Statement of Material Facts demonstrate (1) the priority of the LCN to the FBI, (2) the importance of maintaining a steady flow of information from informants is demonstrated through Section 108 of the Manual of Instructions, SAC letters, annual office inspections, and promotions and incentives to special agents handling informants, (3) the benefits of the Flemmi-Bulger combination were accepted by the FBI despite notice of their homicidal background, (4)

---

[9] The Defendant notes that the Plaintiffs "did not depose Connolly". U.S. Opposition at 5. While this is true, it is not due to any fault of the Plaintiffs, but because Connolly refused to be deposed. See (Ex. IV K).

furthering of the goals of the FBI through Flemmi and Bulger information, (5) the FBI's

recognition of Connolly as an outstanding agent and (6) Connolly's own words found in FBI

documents and his statements to the media. See Memorandum of Law in Support of Plaintiffs'

Motion for Summary Judgment at 16-17, Docket No. 111.

Second, while the Defendant asserts that Lipsett "explain[ed] the application of summary

judgment standard where the disputed issue properly turns on a question of motive or intent," the

Defendant fails to acknowledge the limited scope of the court's reasoning to sexual

discrimination contexts. Lipsett, 864 F.2d at 895; U.S. Opposition at 5. Lipsett and the cases to

which it cites are far removed from this case.[10]

The Defendant proposes that there is another inference to be made that Connolly leaked

Castucci's identity based solely upon his own interests. The Defendant asserts that:

> Connolly's propensity to serve his own interests is established by his racketeering
> conviction, see United States v. Connolly, 341 F.3d 16, 27 (1st Cir. 2003) ("The evidence
> showed that Connolly, Bulger, Flemmi, Salemme, and others worked together in an
> association-in-fact enterprise over a period of almost two decades, joining forces to
> protect themselves from prosecution and to further other criminal activities . . . ."), and
> underscored by Flemmi's testimony that Connolly accepted more than $200,000 from
> Bulger and Flemmi. See Flemmi Depo. Tr. at 233:9-19 (Ex. A).[11]

The Defendant's reliance upon the racketeering convictions of Connolly is spurious for several

reasons. Even if Connolly was motivated in part by his own interests, this additional motivation

is not sufficient to defeat the Plaintiffs' claim that he was motivated, at least in part, by a purpose

---

[10] Lipsett and the cases it relies upon consist of sexual and racial discrimination and antitrust litigation matters due to the unreliability of one person's word against another's. Id.; see also Poller v. Columbia Broadcasting System, Inc. 368 U.S. 464, 473 (1962) ("summary judgment procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators and hostile witnesses thicken the plot.") (emphasis added). It seems highly unlikely that these cases were intended to enact a major scaling back of the use of summary judgment in which any mention of motive or intent is made.

[11] The Defendant's reliance on Connolly's alleged "propensity to serve his own interests" is barred under FED. R. EVID. 404(a). See FED. R. EVID. 404(a) ("Evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion..."). The racketeering convictions and bribes proffered by the Defendant do not fall under the FED. R. EVID. 404(b) exception for proof of motive or intent, since these events took place more than five years after Castucci's death and are irrelevant under FED. R. EVID. 401. See FED. R. EVID. 401; see also FED. R. EVID. 404(b).

to serve his employer.[12]   Under Massachusetts law, "the fact that the predominant motive of the [employee] is to benefit himself does not prevent the act from coming within the scope of employment . . ." Wang, 398 Mass at 859-60. Only "if the employee 'acts from purely personal motives . . . in no way connected with the employer's interests, [is] he considered in the ordinary case to have departed from his employment . . .'" Pinshaw v. Metro. Dist. Comm'n, 402 Mass. 687, 694-95 (1988) (quoting W. Prosser & W. Keeton, Torts 506 (5th ed. 1984)). By offering the racketeering conviction as proof of another potential motive, that of maintaining his relationship with Bulger, Flemmi and others, the Defendant has still failed to contradict, rebut, or disprove the Plaintiffs' evidence that Connolly acted, at least in part, to serve the interests of the FBI. The inference that the government would draw, that Connolly was motivated by his relationship with Bulger and Flemmi, is not contrary to the Plaintiffs' inference that Connolly was motivated in part by a purpose to serve the FBI, as these inferences are not mutually exclusive. As fully briefed by the Plaintiff, the Defendant's alleged "personal" motive of Connolly could still benefit the interests of the FBI, as maintaining these relationships would allow the FBI to keep receiving information on LCN from their informants Bulger and Flemmi. See Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment at 15-16.

Moreover, in U.S. v. Connolly the jury was instructed on Racketeering Charge #7, the obstruction of justice via the leak of Castucci's informant status to Bulger, as follows:

> Whoever corruptly ... endeavors to influence, intimidate or impede any ... officer in or of any court of the United States ... or corruptly ... influences, obstructs or impedes or endeavors to influence, obstruct or impede the due administration of justice, shall be guilty of a crime (emphasis added).

---

[12] In McIntyre v. United States, this Court held that Connolly's conduct was motivated in part by bribes and his friendship with Bulger and Flemmi and in part by his motive to serve his employer. See Memorandum of Findings of Fact and Conclusions of Law at 94, McIntyre v. United States, Civ. No. 01-CV-10408-RCL.

See Att. C, Jury Instructions, U.S. v. Connolly Day 12, at 198:12-16. The jury was further

instructed that if Connolly believed that the FBI had authorized him to "engage in particular

activity or disclose certain information to Bulger and Flemmi as informants ... he could not have

acted corruptly" and thus could not be found guilty. Id. at 199; 24-25 and 200; 1-6.

> [Y]ou shall not find Mr. Connolly guilty of obstruction of justice if you believe the FBI
> authorized Mr. Connolly, or that Mr. Connolly believed the FBI authorized him, to
> engage in particular activity or disclose certain information to Bulger and Flemmi as
> informants. If Mr. Connolly was authorized or believed he was authorized by the FBI to
> do certain acts he could not have acted corruptly. Id.

The jury was instructed that to prove obstruction of justice, one must not only act corruptly, but

must do so intentionally.[13] Id. at 199; 18-19. "As I explained earlier the word 'corrupt' means

having the improper motive or purpose of obstructing justice." Id.

Following such an instruction, the jury found that Connolly's guilt of Racketeering

Charge #7 had not been proven beyond a reasonable doubt. See Att. D, Verdict Slip at 3. The

acquittal raises an inference that the jury did not believe Connolly had a corrupt intent when he

leaked the identity of Castucci to Bulger, but that he was motivated by another purpose, that of

serving the interests of the FBI.

Lastly, Connolly was found guilty of Racketeering Charges #4, #11, #12, #13, and #14.

See Att. D., Verdict Slip at 3, 5-6. The events leading to Racketeering Charge #4 took place in

late 1982 or early 1983. Id. at 3. The events which comprised the remaining convictions took

place between late 1994 and 1998. Id. at 5-6. The Defendant cannot create a material fact that

Connolly was a racketeer and solely motivated by personal interests in 1976 from this evidence.

---

[13] "The final element that the government must prove beyond a reasonable doubt is that the defendant corruptly,
obstructed or impeded, or endeavored to obstruct or impede the proceeding ... Even if McDonald's and Sims'
arrests and prosecutions were impeded, Mr. Connolly can be guilty of obstruction of justice only if, by providing
information to Bulge and Flemmi, he intended that specific result." Id. at 199; 14-17, 20-23.

The Defendant also refers to Flemmi's deposition testimony that he and Bulger gave Connolly in excess of $200,000 over the years as evidence that Connolly was acting solely to advance his own interests. U.S. Opposition at 6 (citing Flemmi Dep. at 233: 9-19 (Ex. 1)). What the Defendant omits, however, is that these payments did not take place until at least 1981, five years after Castucci's murder. See Att. B, Tr. Day 2:97. Flemmi was questioned on this issue, under oath:

> **Q.** …What was the X fund?
> **A.** X fund was a fund we had – we kept aside for purposes that are like if we had to buy something or pay for somebody – whatever the reason was, so we didn't have to come up with money out of our own funds, we kept it – it was an extra fund, it was a slush fund.
> …
> **Q.** … Did you ever take money from the X fund and give it to any agents from the FBI?
> **A.** Yes.
> **Q.** No, which agents?
> **A.** Well, there was John Connolly …
> **Q.** When did you start providing agents money from the X fund?
> **A.** I think we started actual cash, I think we started back in '81, around that time.
> **Q.** And for how long did this practice continue?
> **A.** Up until 19 – 1990.
> **Q.** How much money did you give Agent Connolly during that time frame?
> **A.** I said in excess of $200,000 but it's around 250. Id. at 96-97 (emphasis added).

The evidence demonstrates that the WHG began paying cash to Connolly in 1981, well after the murder of Castucci. Thus, the cash payments are completely irrelevant to the Defendant's argument. None of the facts or legal arguments asserted by the Defendant establish a genuine issue of material fact that Connolly acted purely on his own personal interests in 1976.

### III.     The Defendant's Legal Argument Challenging the Plaintiff's Additional Theories of Recovery Fails as a Matter of Law

When no genuine issue of material fact exists, a motion in favor of summary judgment should be entered if the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

### A. The Discretionary Function Exception to the FTCA does not Viciate the Defendant's Duties Under its Special Relationship with Informants

Massachusetts law recognizes that a person has a duty to control the conduct of third persons based upon a special relationship between: (1) "the actor and the potential plaintiff" and (2) "the actor and the third person." Jean W. v. Commonwealth, 414 Mass. 496, 513 (1993); see Estate of Davis v. United States, 340 F. Supp. 2d 79, 91 (D. Mass. 2004) (finding that a special relationship existed between the FBI and informants Bulger and Flemmi which required the FBI to control their conduct to prevent harm to third persons). A special relationship exists when "a defendant reasonably could foresee that he would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so." Irwin v. Ware, 392 Mass. 745, 756 (1984); see Kavanagh v. Trustees of Boston University, 440 Mass. 195, 203 (2003) (finding foreseeability in duty to protect context to mean specific information about a person "suggesting a propensity to engage in violent conduct").

The Defendant has argued at length that the Discretionary Function Exception to the FTCA bars claims based on *the selection of and the decision to use* informants, while failing to address and refute the legal argument presented by the Plaintiff based upon the general tort duty created by a special relationship. See Defendant's Opposition to Plaintiffs' Motion for Summary Judgment at 10-14. The distinction here lies in the fact that a person who has a special relationship with another and reasonably foresees harm to that other by their failure to act is under a duty to act because of that special relationship. Jean W., 414 Mass. at 513. There is no discretion not to act to protect the other in the special relationship without liability for the breach of that duty. Id.

The Plaintiff has not made a claim, as the Defendant suggests, that liability is premised here on the Defendant's failure to investigate or prosecute criminal acts; in fact, that argument is not found anywhere in the Plaintiff's memorandum of law. See Defendant's Opposition to

Plaintiffs' Motion for Summary Judgment at 14.  Similarly, the Plaintiff has not argued that the Defendant is liable for negligent or improper selection of informants.  Id. at 13.  Nor has the Plaintiff premised liability here on the negligent supervision of FBI agents.  Id. at 18.  Thus, the discretionary function exception does not apply to bar the Plaintiffs' actual argument, the breach of a duty to control and protect informants under a special relationship.  Estate of Davis, 340 F. Supp. 2d at 91 (special relationship between FBI and Bulger required FBI to control his conduct to prevent harm to third persons); Kavanagh, 440 Mass. at 201 (finding duty to protect from criminal conduct of third party in special relationship between defendant and injured victim).

Even if the discretionary function exception did apply, as the Defendant argues, failing to prevent the murder of one informant by another does not come within the purview of the exception.  Conduct is not discretionary if it violates FBI policies and procedures.  Coyne v. United States, 270 F. Supp. 2d 104, 117 (D. Mass. 2003) (quoting United States v. Gaubert, 499 U.S. 315, 324 (1991) ("Where an employee violates an established policy or regulation, 'there will be no shelter from liability.'")); Irving v. United States, 162 F.3d 154, 164 (1st Cir. 1998) ("informal agency rules and similar pronouncements may at times bind agency personnel for the purposes of discretionary function analysis."); Irving, 162 F.3d at 166 (stating that statues, regulations, and agency guidelines are not the exclusive source of policy).  While law enforcement agencies may have the discretion to choose how to go about enforcing the law, they do not have the discretion of whether or not to enforce the law at all.  See Horta v. Sullivan, 4 F.3d 2, 21-22 (1st Cir. 1993) ("Generally, although *law enforcement agents have a mandatory duty to enforce the law*, decisions as to how best to fulfill that duty are protected by the discretionary function exception to the FTCA.") (emphasis added).  Under the Defendant's theory, the discretionary function exception would act as a shield to any and all claims made

against the government's use of informants. See Defendant's Opposition to Plaintiffs' Motion

for Summary Judgment at 13; cf. Coyne v. United States, 270 F. Supp. 2d 104, 112 (D. Mass.

2003) ("the government's treatment of Coyne's allegations at this broad level of abstraction

would enable the discretionary function exception to swallow the FTCA 'rule' of liability").  If

this theory were true, FBI agents would have the discretion whether or not to control the

foreseeable violent conduct of their informants and whether or not to protect their informants

from foreseeable harm.  Surely, there would be no "plausible policy justification" for that

conduct, and even if there was, that would "not [be] the sort of discretion that Congress intended

to protect" by enacting the discretionary function exception. Shansky v. United States, 164 F.3d

688, 692 (1st Cir. 1999); Limone v. United States, 336 F. Supp. 2d 18, 39 (D. Mass. 2004).  The

Defendant cites to Pooler v. United States for the proposition that the extent of control over an

informant is a policy decision.  See Defendant's Opposition to Plaintiffs' Motion for Summary

Judgment at 13.  However, the Defendant omitted the sentence proceeding its Pooler quote:

> If the issue was the use of an undercover agent *or informant whose known tendencies*
> *toward violence suggested a risk of physical harm either to the targets of an investigation*
> *or to all bystanders, the case might well be different.* In addition, *if the complaint were*
> *that agents of the government in the course of an investigation had violated constitutional*
> *rights or federal statutes, the outcome would be different since federal officials do not*
> *possess discretion to commit such violations* (emphasis added).

Pooler v. United States, 787 F.2d 868, 871 (3d Cir. 1986).  The Defendant's own case

makes clear that the discretionary function exception is inapplicable to the case at bar.  Id.

Finally, the Defendant has not cited to any case law which refutes the Plaintiff's claim

that the FBI had a duty to protect Castucci under the special informant relationship.  The

Defendant only cites to persuasive authority that deals with the supervision of federal *witnesses*.

See Defendant's Opposition to Plaintiffs' Motion for Summary Judgment at 18-19.  The

Defendant has failed to cite any relevant law which places the protection and control of FBI

informants within the discretionary function exception, thereby failing to oppose the Plaintiff's

argument that the Defendant is liable for the reasonably foreseeable harm caused to Castucci

based on the special relationship between Castucci and the FBI and between the FBI and Bulger.

See Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment at 27-28.

### B. The Defendant had a Nondelegable Duty to Give Care in the Protection of Castucci's Informant Identity

"A nondelegable duty is an affirmative obligation to ensure the protection of the person

to whom the duty runs." Meyer v. Holley, 537 U.S. 280, 290 (2003) (quoting General Building

Contractors Assn., Inc. v. Pennsylvania, 458 U.S. 375, 396 (1982)).  A nondelegable duty may

be created by express agreement.  O'Brien v. Christensen, 422 Mass. 281, 287 (1996).

The Defendant has argued that a private individual cannot be liable for breaching a

nondelegable duty, that the Plaintiff did not cite any Massachusetts case law in which such could

occur, and therefore that the FTCA does not apply.  See Defendant's Opposition to Plaintiffs'

Motion for Summary Judgment at 19-20.  However, in the paragraph proceeding that statement,

the Defendant cites to the same Massachusetts case law that the Plaintiff did in which a private

individual was found liable for breaching a nondelegable duty.  Id. at 19; cf. Plaintiffs'

Memorandum of Law in Support of Motion for Summary Judgment at 28-30 (citing Banaghan v.

Dewey, 340 Mass. 73 (1959)).[14]  It is clear from Banaghan that an individual in Massachusetts

may be found liable for breaching a nondelegable duty created by express agreement to give care

---

[14] In Banaghan, the trustees of a building (private individuals) were found liable for not keeping an elevator in safe operating condition pursuant to agreement, and liability attached for breach of that nondelegable duty even when the trustees carefully selected an independent contractor to keep such safe. Banaghan, 340 Mass. at 80. In O'Brien, the Supreme Judicial Court stated that a nondelegable duty could be created by a "voluntarily assumed contractual responsibility," in that case the duty to keep a landowner's premises continuously in repair, ultimately did not find liability where such an agreement was not present. O'Brien v. Christensen, 442 Mass. 281, 293 (1996).

in the protection of another.  See Banaghan, 340 Mass. at 80; O'Brien v. Christensen, 442 Mass. 281, 287 (1996) (characterizing Banaghan agreement as "an express agreement" to give care).

As the Defendant has cited, "the critical question [in determining whether a duty is nondelegable] is whether the responsibility is so important to the community that it should not be transferred to another."  Colmenares Vivas v. Sun Alliance Ins. Co., 807 F.2d 1102, 1107 (1st Cir. 1986) (citing W. Keeton, D. Dobbs., R. Keeton & D. Owen, Prosser and Keeton on the Law of Torts § 39, at 250-51 (5th ed. 1984).  The Defendant makes no argument that the responsibility of keeping informant identities safe is not nondelegable.  Indeed, it would be a difficult to make the argument that keeping such safe is not an important responsibility; generally, one would believe that preventing murder, the likely result of an informant identity leak, is important to the community.  Therefore, the Defendant has failed to cite any authority which prohibits the creation of a nondelegable duty by express agreement between the FBI and an informant with regard to keeping an informant's identity safe.  The FBI and Castucci had an express agreement that the FBI would protect Castucci's confidential informant identity.  See Plaintiffs' Statement of Material Facts, No. 257.  The FBI breached this duty when Connolly leaked Castucci's informant identity to Flemmi and Bulger, resulting in the murder of Castucci. Id. at 359, 361, 373-74, 377.  Defendant's opposition does not create any genuine issue of material fact; thus, summary judgment is proper.

Respectfully submitted,

The Estate of Richard J. Castucci

Dated: June 30, 2007

 /s/ Michael Laurano
Michael A. Laurano
BBO# 288200
15 Court Square, Suite 360
Boston, MA 02108
(617)523-4499
